# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Robin Kirkland Neal,<br><br>Plaintiff,<br><br>v.<br><br>Daniel Ficcadenti, in his individual capacity as an officer of the St. Paul Police Department, and the City of St. Paul,<br><br>Defendants. | Case No. 15-cv-2429 (SRN/FLN)<br><br>**MEMORANDUM OPINION AND ORDER** |

Oliver E. Nelson III, Magna Law Firm, 2915 Wayzata Boulevard, Minneapolis, Minnesota 55403, for Plaintiff.

Margaret E. Jacot, St. Paul City Attorney's Office, 15 West Kellogg Boulevard, St. Paul, Minnesota 55102, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment [Doc. No. 18]. For the reasons stated herein, Defendants' motion is granted in part and denied in part.

## II.   BACKGROUND

This lawsuit arises from an unfortunate case of mistaken identity. Late in the evening of June 6, 2012, officers of the St. Paul Police Department ("SPPD") received a dispatch report that a witness had seen a man retrieve a firearm from a black, four-door

sedan parked outside of Born's Bar on Rice Street. (*See* DeTomaso Aff. [Doc. No. 21], Ex. A at 3.) The suspect was described as a black male in his forties, of heavier build, and wearing a baseball cap and red and white shirt. (*See id.*) Born's Bar is located in a rough area of town and SPPD officers are frequently called to the area generally—and to the bar specifically—to address criminal activity. (*See* Tschida Aff. [Doc. No. 22] ¶ 2.)

Upon receipt of the dispatch report, several SPPD officers proceeded to the scene, where squad car video recorded much of the subsequent events. (*See generally* DeTomasso Aff., Ex. B.; Tschida Aff., Ex. B. ; Ficcadenti Aff. [Doc. No. 24], Ex. C.) Officer (now Sergeant) Michael DeTomaso was one of the first officers to arrive at the scene. (DeTomaso Aff. ¶ 5.) He spotted a black, four-door sedan parked outside of Born's Bar, with multiple black males inside it. Officer DeTomaso exited his squad car, drew his pistol, and ordered the driver of the sedan to exit with his hands up. (*Id.*, Ex. B at 23:22:28.) The driver—who was wearing a blue shirt and ball cap—complied with these instructions and was taken into custody without incident. (*Id.* at 23:22:56.)

By this time, several other officers had arrived at the scene, including Defendant Officer Daniel Ficcadenti. (Ficcadenti Aff. ¶ 5.) Shortly after the driver was placed in custody, officers directed the two remaining passengers to exit the sedan.[1] (DeTomaso Aff., Ex. B at 23:23:20.) Both men exited the vehicle at approximately the same time. Plaintiff Robin Neal was seated in the front passenger seat, and emerged wearing a black shirt and

---

[1] In addition to instructions to the "passengers in the car" to step out of the vehicle, at least one officer can be heard yelling, "Red shirt, step out." (DeTomaso Aff., Ex. B at 23:23:20.) As events proved that none of the occupants of the sedan was wearing a red shirt, this suggests that at least at this point in the encounter officers were still under the mistaken impression that their suspect was in the sedan.

2

dark shorts. (Ficcadenti Aff. ¶ 6.) The other passenger, Anthony Lee, was wearing a blue shirt. (*Id.*) Neal, Lee, and the driver were all in their early fifties.

The officers yelled to the passengers to come forward one at a time, and started directing Neal (who they generally identified as "black shirt") to walk towards them. (DeTomaso Aff., Ex. B. at 23:23:41.) Review of the squad car footage shows that Neal remained standing behind the sedan for several seconds before walking around to the front of the car. (*See id.* at 23:23:53-23:24:06.) Although his hands remain generally over his head, at times he appears to drop them toward his sides. (*See id.*) At one point, Neal turns completely so that his back is facing the officers, and lowers his hands. (*See id.* at 23:24:16.) The scene is one of some confusion—at least two officers, located in different positions on the street, appear to be shouting instructions to Neal, the sedan is floodlit by a bright police spotlight, squad car lights are flashing, and a police K-9 dog can be heard barking repeatedly in the background.[2] (*See id.*)

Eventually, Neal began to walk towards Officer Ficcadenti with his hands raised and without any apparent resistance. (*Id.* at 23:24:22.) Once he arrived, instead of handcuffing him, Officer Ficcadenti used an arm-bar takedown technique[3] to throw Neal to the ground

---

[2] Although presumably unknown to the officers at the time, later evidence showed that Neal was also intoxicated, which may have added to his apparent confusion. (*See* Ficcadenti Aff., Ex. A at 2.)

[3] An arm-bar takedown is apparently a non-lethal force technique that allows an officer to "use his own strength, speed, momentum, and leverage to bring a suspect to the ground." (DeTomaso Aff. ¶ 12.) The officer "holds the suspect's arm with one hand, uses his forearm near the elbow and then pivots, using the momentum to take the suspect to the ground, while doing his best to control the speed of descent." (*Id.*) SPPD officers are apparently trained to use the arm-bar as a non-lethal force option when necessary "to gain control of a suspect in a tense, uncertain and rapidly evolving, volatile situation." (*Id.*)

and on to his stomach, where Ficcadenti then proceeded to handcuff him. (*See id.* at 23:24:27.) At that point, Ficcadenti noticed that Neal had suffered cuts to his forehead, and an ambulance was called to assess his injuries.[4] (*See* Ficcadenti Aff., Ex. C at 23:27:36.)

Shortly after Officer Ficcadenti took Neal into custody, Officer DeTomaso detained the other passenger without incident. (DeTomaso Aff., Ex. B at 23:24:38.) At approximately the same time, officers received an updated dispatch report indicating that the suspect they were searching for had just exited Born's Bar. (Tschida Aff., Ex. B at 23:24:20.) Officers Michael Tschida and Jordan Walker subsequently detained the individual and discovered a hammer in his waistband. (*See* Tschida Aff. ¶ 7.) No weapons were found on any of the occupants of the sedan.

The evidence indicates that Officer Ficcadenti had been trained in use of force techniques, and that he had knowledge of the St. Paul Police Department Manual ("SPPD Manual"). (Nelson Aff., Ex. D ("Ficcadenti Dep.") at 15:24-17:10.) Officer Ficcadenti testified that the SPPD Manual provides that "physical force may not be resorted to unless other reasonable alternatives have been exhausted or would be clearly ineffective under the particular circumstances," and that he had been trained to follow that principle. (*Id.* at 25:3-16.) The SPPD Manual further requires that officers only resort to physical force "when other options have failed or are unreasonable to resort to under the circumstances. Any physical force used by the officer must be necessary and reasonable under the circumstances." (*Id.* at 26:6-12.) Physical force is "reasonably necessary" when "no

---

[4] Neal was later taken to Region's Hospital where he was diagnosed with a closed head injury, abrasions, and a sickle cell crisis. (*See* Nelson Aff. [Doc. No. 28], Ex. I at 4.)

reasonably effective alternative appears to exist and the amount of force used is reasonable to effect the lawful purpose intended." (Nelson Aff., Ex. G ("SPPD Manual") § 246.01.)

At his deposition, Officer Ficcadenti testified that he never attempted to use other, non-physical options to arrest Neal, such as ordering Neal to turn around so that he could be handcuffed, or having him get on his knees with his hands behind his head. (*See* Ficcadenti Aff. at 45:13-23; 46:11-16.) Officer Ficcadenti testified, however, that his arrest of Neal was in compliance with the policies set forth in the SPPD Manual, because his actions were not intended to cause Neal injury, and did not in fact cause significant injury. (*See id.* at 49:10-18.) Likewise, Officer DeTomaso testified that Ficcadenti's use of an arm-bar was necessary because of the fluidity of the situation confronting the officers, the need to quickly restrain an individual who may have been armed, and because of the need to remove a distraction that was preventing focus on the remaining, un-detained passenger. (DeTomaso Aff. ¶¶ 11, 12.)

On May 7, 2015, Neal filed suit against Officer Ficcadenti in his individual capacity, pursuant to 42 U.S.C. § 1983. He alleges that Officer Ficcadenti violated the Fourth Amendment's prohibition against excessive force when he used the arm-bar takedown technique on June 6, 2012. (*See* Compl. [Doc. No. 1] ¶¶ 24-30.) Neal also brings a claim under *Monell v. New York City Dep't of Social Servs.*, 438 U.S. 658 (1979) against the City of St. Paul, alleging that the City should be held liable for Officer Ficcadenti's conduct because the City allegedly has failed to train its officers on the appropriate use of force. (*See* Compl. ¶¶ 31-36.) Defendants subsequently moved for summary judgment as to both claims on December 30, 2016.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of genuine issue of fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where a video recording accurately captures the events forming the basis of the complaint, however, the Court need not adopt the nonmoving party's version of events if clearly contradicted by the video evidence. *See Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *See Grant v. City of Blytheville*, 841 F.3d 767, 770 (8th Cir. 2016).

### B. Excessive Force

Neal argues that Officer Ficcadenti's actions on the night of June 6, 2012 constituted excessive force in violation of the Fourth Amendment prohibition against unreasonable

seizures. *See* U.S. Const. amend. IV; *see also Lollie v. Johnson*, 159 F. Supp. 3d 945, 958 (D. Minn. 2016) (noting that "[e]xcessive force claims brought pursuant to 42 U.S.C. § 1983 are analyzed as seizures under the Fourth Amendment") (citing *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006)). The use of force is excessive under the Fourth Amendment if it is not "objectively reasonable under the particular circumstances." *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994). In analyzing the "circumstances" at play in any given case, courts consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The reasonableness of an officer's use of force is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Thus, force that later seems excessive may not be unconstitutionally so when examined in the light of an officer's need to make a "split second judgment" in a "tense, uncertain, and rapidly evolving" situation. *Id.* at 396-97. Considerations of perspective and the fluidity of the encounter are lessened, however, when the facts suggest that rapid decisions are unneeded. *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009). Ultimately, the court is tasked with balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012).

Here, Defendants raise several arguments for why Officer Ficcadenti's takedown of Neal was objectively reasonable as a matter of law. First among these is that the nature of

7

the suspected crime justified a more physically coercive manner of effecting Neal's arrest. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. [Doc. No. 20] ("Defs.' Mem.") at 9.) Defendants note that officers had been called to the scene expressly because a witness had seen a man exit a bar with a history of criminal activity and retrieve a firearm. (*See id.*) "Presumably, the witness who reported the incident was concerned that the man with the gun intended to commit a violent act against another person." (*Id.*) Accordingly, Defendants argue that Officer Ficcadenti was naturally concerned with preventing a deadly assault—whether against a civilian or a responding officer. (*Id.*)

It is manifestly correct that police officers responding to the scene thought it likely that they might encounter a man with a gun and unknown intentions, and Neal does not dispute this point. Likewise, it does not appear to be contested that officers originally held a good faith belief that one of the occupants of the black sedan in which Neal was seated might be their suspect.[5] But it does not follow that these facts alone necessarily rendered Officer Ficcadenti's actions several minutes later objectively reasonable. As this court has observed in the past, "officers called to respond to a serious felony are not thereby entitled to ignore relevant information that emerges once they arrive on the scene." *Stockton v. Auren*, No. 07-cv-556 (JRT/FLN), 2008 WL 1994992, at *4 (D. Minn. May 5, 2008); *see also Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (finding that even though officer was responding to a severe crime involving the shooting of a fellow officer, officer's observations after arriving on the scene should have diminished the perceived threat posed by the plaintiff). Here, officers knew that they were looking for a black man in his forties,

---

[5] *See, e.g.*, *supra* note 1.

wearing a red and white shirt and a baseball cap. But as each occupant of the black sedan stepped out of the car, it would have become immediately apparent that none of them closely matched that description. Indeed, Officer Ficcadenti identified Neal as "black shirt" when yelling instructions, making it clear that he recognized and appreciated that Neal was not dressed in a fashion similar to the reported suspect. (*See* Ficcadenti Aff. ¶ 6.) While these discrepancies do not render Officer Ficcadenti's actions *necessarily* unreasonable, they do raise a question as to whether a reasonable officer would have begun to see that it was increasingly unlikely that any of the occupants of the sedan was the suspect. *Cf. Stockton*, 2008 WL 1994992, at *4 (observing that a reasonable officer responding to scene of suspected burglary might have quickly realized that the plaintiff—who was elderly, frail, wearing bed slippers, and apparently disoriented—was unlikely to have committed the crime).

Similarly, the actions of Officer Ficcadenti's fellow officers that night raise doubts as to whether his actions were truly those of a reasonable officer. Given that none of the occupants of the sedan was clearly identifiable as the suspect, it is just as likely that the driver and the second passenger possessed the gun as it is that Neal had it. Yet, neither of the officers who arrested these individuals felt compelled to resort to violence in making the arrests. Considering this fact, a jury could find that a reasonable officer would not have concluded that the suspected crime *alone* rendered physical coercion necessary in making an arrest of Neal.

Defendants' second, related argument is that a reasonable officer in Officer Ficcadenti's shoes would have perceived Neal as posing a potentially immediate threat to

9

his or her safety, as well as the safety of others in the vicinity. (*See* Defs.' Mem. at 11.) Defendants note, for instance, that Born's Bar is located in a rough part of town, and is the frequent site of criminal activity and violence. (*See* Ficcadenti Aff., Ex. A at 3.) At the time of the encounter, it was unclear if Neal had a weapon, and Defendants contend that he refused or failed to comply with their instructions for some time. But as the Court has already noted, the fact that Neal did not match the description of the suspect, combined with the fact that he generally kept his hands up and was not resisting at all, tends to belie any conclusion that he was immediately threatening. At the very least, when the facts are viewed in the light most favorable to Neal, Neal's actions and appearance "might reasonably be seen to mitigate the perceived threat to the officers." *Stockton*, 2008 WL 1994992, at *4.

Finally, Defendants argue that Neal's own actions rendered force reasonable, and perhaps even necessary. (*See* Defs.' Mem. at 11-12.) By their account, officers at the scene—including Officer Ficcadenti—tried repeatedly to get Neal to "submit willingly to a search and restraint." (*Id.* at 11.) To that effect, officers gave Neal multiple directives "for more than a minute" to come to them with his hands up. (*Id.*) They contend that these directives were clearly and unmistakably directed at Neal (for instance, by prefacing them with the identifier "black shirt"), and that the commands themselves were equally clear and unmistakable in their meaning. (*Id.*) Despite these clear and reasonable orders, Defendants suggest that Neal acted erratically—wandering around the car, pacing to and fro, sometimes dropping his hands to his sides, and at one point turning his back to the officers. (*Id.*) While Defendants stop short of characterizing Neal's actions as active resistance, they do

10

suggest that he was, essentially, engaged in passive resistance. *Cf. Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006) ("When a suspect is passively resistant, somewhat more force may reasonably be required."). Given these circumstances, they argue that a reasonable officer would have found it necessary or desirable to actively and quickly restrain Neal. (*See* Defs.' Mem. at 12.)

Taking the facts in the light most favorable to Neal, however, and drawing reasonable inferences in his favor, a very different reading of events can be constructed. At his deposition, Neal testified that the scene confronting him when he stepped out of the sedan was fairly chaotic—several officers were pointing pistols at him, police sirens and lights were going off, and at least one dog was barking. (*See, e.g.*, Nelson Aff., Ex. C ("Neal Dep.") at 35:10-13.) When officers told him to put his hands up, he complied. (*Id.* at 40:6-7.) Although Neal testified that he was trying to be "compliant and agreeable" and was just "trying to . . . get taken into custody [so as to] let [the police officers] do their work," his attempts at compliance were complicated by the fact that more than one officer was shouting directions at him, making it hard for him to know what to do. (*Id.* at 37:23-25; 41:1-5.) Although Neal admits that at times he dropped his hands to his sides temporarily, he states that this may have been because he thought a police officer was going to come and take him into custody at that point. (*See id.* at 40:15-18.) To the extent that he may have been reticent about closely approaching Officer Ficcadenti, he states that it was because the K-9 dog next to Officer Ficcadenti put him in fear of being bitten. (*See id.* at 39:9-11.)

All in all, a jury could conclude from this rendering of events—which is not contradicted by the squad car video—that Neal was acting earnestly (albeit a bit slowly) in

11

trying to comply with the commands he received. Indeed, Defendants make no allegations that Neal was acting threateningly, or that he was resisting arrest, and Officer Ficcadenti agreed at his deposition that Neal ultimately complied with all orders that he was given. (*See* Ficcadenti Dep. at 39:1-15.) In such a situation, the Eighth Circuit has recognized that it would not be reasonable for an officer to use "more than de minimis force" against the plaintiff. *See Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010). Given the violent manner in which Officer Ficcadenti took Neal to the ground, and the injuries he suffered, a jury could certainly conclude that more than de minimis force was deployed. At the very least, a jury could find that a reasonable officer would have attempted—in compliance with the requirements of the SPPD Manual—to use a less aggressive technique in effecting Neal's arrest before resorting to an arm-bar takedown. (*See* SPPD Manual § 246.01.)

Taken on the whole, therefore, the Court concludes that a jury viewing the facts in the light most favorable to Neal could conclude that Officer Ficcadenti's use of an arm-bar takedown was not reasonable in light of events as they evolved, the apparent threat posed by Neal, and Neal's actions in responding to officer commands. *Cf. Stockton*, 2008 WL 1994992, at *5. Accordingly, the Court finds that genuine issues of material fact exist regarding whether the use of force in this case was excessive under all the circumstances, and that summary judgment as to this issue is improper.

### C. Qualified Immunity

Defendants next argue that, even if summary judgment is not warranted directly on Neal's excessive force claim, Officer Ficcadenti is nonetheless entitled to qualified immunity from suit. The doctrine of qualified immunity serves to protect government

officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Its purpose is, in part, to allow "officers to make reasonable errors so that they do not always 'err on the side of caution.'" *Habiger v. City of Fargo*, 80 F.3d 289, 295-96 (8th Cir. 1996) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (8th Cir. 1991)). In determining if qualified immunity is applicable, the court must perform a two-part analysis, asking: (1) whether the facts show the violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Because the Court has already found that sufficient facts exist to allow Neal's Fourth Amendment excessive force claim to proceed, the inquiry collapses at this stage into a consideration of whether the relevant constitutional right was clearly established on June 6, 2012.

The Eighth Circuit has repeatedly made clear that "[t]he right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." *Brown*, 574 F.3d at 499 (citing *Graham*, 490 U.S. at 396). The Supreme Court has been equally clear, however, that merely reciting the "general proposition" against excessive force "is not enough." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Rather, the "right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in

question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted).

Taking the facts in the light most favorable to Neal, the Court finds here that "the contours of the right at issue were sufficiently clear that a reasonable official standing in Officer [Ficcadenti's] shoes would have understood that the amount of force he used was excessive." *Shannon*, 616 F.3d at 864. In particular, the Court observes that the Eighth Circuit had made unmistakably plain by 2012 that the "use of force against a suspect who was not threatening and not resisting may be unlawful." *Id.* In *Shannon*, for instance, that court found that it was not reasonable for an officer to aggressively take the plaintiff to the ground simply because the plaintiff was using profanity toward the officer and may have poked him once in the chest with a finger. *See id.* at 858, 865. While the court observed that the plaintiff's actions may have been "disrespectful, even churlish," that alone did not justify force when he was not otherwise resisting arrest or acting in a threatening manner. *Id.* at 864-65; *see also Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) ("Force can only be used to overcome physical resistance or threatened force . . . .") (citation omitted); *Feemster v. Dehntjer*, 661 F.2d 87, 89 (8th Cir. 1981) ("There is no occasion for the use of any force against a prisoner who quietly submits.").

In addition, this Court has considered facts similar to those presented in this case in the past and found that the use of force was not warranted. In particular, in *Stockton v. Auren*, Judge Tunheim concluded that officers responding to a reported burglary were not justified in using force to take the plaintiff to the ground. Although the Court recognized

the severity of the crime, the fact that officers could not be sure that the plaintiff was unarmed, and the fact that the plaintiff did not respond to instructions, it found that a reasonable officer would likely not have felt that force was necessary given that the plaintiff made no threatening or aggressive moves, was elderly, and did not attempt to escape. *See* 2008 WL 1994992, at \*2, \*4-6.) In such circumstances, the Court concluded that it was clearly established that an arm-bar takedown was not a justifiable technique for officers to employ. *See id.* at \*7-8; *see also Hagen v. Palmer*, No. 02-cv-4318 (RHK/AJB), 2003 WL 22136067, at \*3 (denying qualified immunity where the facts suggested defendant had misused an otherwise valid policing technique).

In light of these constitutional guideposts, and taking the evidence in the light most favorable to Neal, the Court is convinced that the right Officer Ficcadenti allegedly violated was clearly established on June 6, 2012. The Court further concludes that a reasonable officer would have known that an arm-bar takedown was excessive based on the same evidence. Accordingly, Officer Ficcadenti is not entitled to qualified immunity at this time.

### D. The *Monell* Claim

In addition to his claim against Officer Ficcadenti, Neal brings a § 1983 claim directly against the City of St. Paul, alleging that it should be held liable for Officer Ficcadenti's conduct based on a failure to adequately train its officers on the appropriate use of force. The Supreme Court has determined that, in certain circumstances, a local government may be liable under § 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such a deprivation. *See Monell*, 436 U.S. at 692. However, local governments may only be held responsible for

15

their *own* illegal acts. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011). "They are not vicariously liable under § 1983 for their employees' actions." *Id.* (citations omitted).

Plaintiffs seeking to impose liability on a local government under § 1983 must prove that "action pursuant to official municipal policy" caused their injuries. *Monell*, 436 U.S. at 691. In certain circumstances, a decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of an official municipal policy. *Connick*, 563 U.S. at 61. However, "[a] municipality's culpability for a deprivation of rights is at is most tenuous where a claim turns on a failure to train," *id.*, and liability will attach "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1988). This stringent standard requires proof that a policymaker disregarded a "known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). Thus, for the municipality to be liable, policymakers must have been on actual or constructive notice that a particular omission in their training program caused city employees to violate citizens' constitutional rights. *Connick*, 563 U.S. at 61. To prove notice, a plaintiff must generally provide evidence that policymakers were aware of a "pattern of similar constitutional violations by untrained employees." *Id.* at 62. Importantly, except in a narrow range of circumstances, reliance on a single incident is insufficient to prove notice. *Id.* at 62-63.

Here, Neal has failed to meet his burden of proving that on June 6, 2012, policymakers of the City of St. Paul were on notice of a pattern of constitutional violations such as he alleges were committed by Officer Ficcadenti. In support of their summary

judgment motion, Defendants have submitted uncontroverted evidence that the SPPD has a policy governing use of force, that it trains its officers on that policy, and that Officer Ficcadenti completed that training. (*See generally* Ficcadenti Aff., Ex. B.; *see also* DeTomaso Aff. ¶¶ 3, 12; Jacot Aff. [Doc. No. 23], Ex. A at 15-18, 25-27.) Neal has not challenged the facial validity of that policy, nor has he pointed to a pattern of violations that would have put City policymakers on notice that their training program was inadequate.

Instead, Neal argues that a pattern of violations can be implied from Officer DeTomaso's testimony that Officer Ficcadenti made the right call when deciding to use the arm-bar technique on Neal. (*See generally* DeTomaso Aff.; Second DeTomaso Aff. [Doc. No. 31].) In Neal's view, the fact that both Officers Ficcadenti and DeTomaso apparently believed that it was proper to use arguably excessive force on the night of June 6, 2012 shows that the City of St. Paul was not properly training its officers on the use of force. But the subjective views of two officers—neither of whom qualifies as a "policymaker"— emanating from a single incident cannot suffice to demonstrate the sort of notice required for a failure to train claim. *See Connick*, 563 U.S. at 62-63. Because Neal has thus failed to present sufficient evidence from which a jury could find that the City of St. Paul violated his rights under § 1983, his claim against the city must be dismissed.

## IV. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. No. 18] is **GRANTED** in part and **DENIED** in part;

2. Plaintiff's claim against Defendant City of St. Paul [Doc. No. 1] is **DISMISSED** with prejudice; and

3. This matter is set for trial on September 25, 2017. A separate trial notice will be issued.

Dated: July 10, 2017
                                                    s/Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Judge